**ELMHIRST v. UNITED STATES.**
No. J–653.

Court of Claims.
March 3, 1930.

Swagar & Sherley, of Washington, D. C., for plaintiff.

J. H. Sheppard, of Washington, D. C., and Herman J. Galloway, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GRAHAM, GREEN, LITTLETON, and WILLIAMS, Judges

GRAHAM, Judge.

The question here involved is whether section 202(a) [1] of the Revenue Act of 1918, 40 Stat. 1060, contemplates a sale of property by an executor and, if it does, whether the "gain" for taxation purposes is the "actual" gain between the purchase price and sale price, or between the appraised value at the death of the testator and the sale price. As section 202 is the only section dealing with taxation in connection with gains and losses from the sale of property, the case turns necessarily on the construction to be given to that section, as the act nowhere specifically provides for any different basis than that fixed by that section where the sale is made by an executor.

---

[1] "That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—

· "(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; and

"(2) In the case of property acquired on or after that date, the cost thereof; or the inventory value, if the inventory is made in accordance with section 203."

. This case involves a direct tax on the estate and not an excise tax.

Whatever may be the conclusion to be drawn from a refusal of a writ of certiorari by the Supreme Court of the United States in a case going up from this court, under the act of 1925, where only a question of law is involved or the construction, as in the McKinney Case, 62 Ct. Cl. 180, of a statute, that court has gone as far, to use its language, as to hold a refusal of a writ "as deciding the question whether the case was one worthy of review" by it. Colgate v. United States, 280 U. S. 43, 46, 50 S. Ct. 22, 23, 74 L. Ed. ——. In that case the court stated, at page 46 of 280 U. S., 50 S. Ct. 22: "It was intended by the act of 1925 to give this Court an opportunity to determine in advance whether the case was one worthy of review here." "One of the chief purposes of the general act of February 13, 1925, ch. 229, 43 Stat. 936 * * * was to abolish appeals from the Court of Claims to this Court and substitute therefor applications for writs of certiorari." Id., page 45 of 280 U. S., 50 S. Ct. 22, 23. And, again, "It was evidently intended by the act of 1925 to make the method of review by this Court of judgments of the Court of Claims, uniform." Id., pages 45, 46, of 280 U. S., 50 S. Ct. 22, 23. This means that the Supreme Court in refusing a certiorari in the McKinney Case did not consider the contentions by the government presented in its brief on certiorari from this court "worthy of review." The instant case presents for this court the rather simple question whether it will be controlled by the decision in the case of McKinney et al. v. United States, supra, certiorari denied, 273 U. S. 716, 47 S. Ct. 108, 71 L. Ed. 855, or whether it will reverse that case. Inasmuch as the certiorari was refused by the Supreme Court, thus indicating that the Supreme Court did not consider the case presented by the government on petition for certiorari "worthy of review," it would seem that this court would at least take a similar view and not undertake to reverse a decision which, after full argument by brief, the Supreme Court refused to reverse.

The brief of the government on its petition for certiorari in that case was a very full brief, and discussed all the questions presented here, and quoted at length from the opinion of Mr. Justice Clarke in Merchants' Loan & Trust Co. v. Smietanka, 255 U. S. 509, 41 S. Ct. 386, 65 L. Ed. 751, 15 A. L. R. 1305, and also from the opinion of the court in Catherwood v. United States (D. C.) 280 F. 241. The same cases are cited and relied up-

on by the government in its brief in the instant case.

Following the McKinney Case, supra, this court decided the case of Nichols et al. v. United States, 64 Ct. Cl. 241. The government took it on certiorari to the Supreme Court (277 U. S. 584, 48 S. Ct. 432, 72 L. Ed. 999) and filed a brief. In that brief it claimed that the Nichols Case reversed the McKinney Case, or at least was in conflict with it. It discussed the decision in the McKinney Case again, and in support of its contention that that case had been reversed cited the appeal of the executrix petitioner in this case to the Board of Tax Appeals and the decision of the board, Appeal of Straight, 7 B. T. A. 177, as holding to the same effect, viz., that the Nichols Case was in conflict with the McKinney Case, and also cited to the same effect Bankers' Trust Co. v. Bowers (D. C.) 23 F.(2d) 941, quoted in brief here.

It was stated in its brief in the Supreme Court in the Nichols Case that after the decision in the McKinney Case the Treasury Department had amended its regulations to conform to that decision, and that thereafter the Board of Tax Appeals in the Appeal of Straight, Executrix, 7 B. T. A. 177 (the instant case), "refused to follow the rule announced by the Court of Claims in the McKinney Case and decided that the amended regulations of the department were wrong. By its decision here the Court of Claims seems to have adopted the theory which it rejected in the McKinney Case. The situation is further complicated by the decision of the United States District Court for the Southern District of New York in the case of Bankers' Trust Co. v. Bowers, decided January 30, 1928 [23 F.(2d) 941], which approved the decision of the Court of Claims in the present case and refused to follow the decision of that court in the McKinney Case."

After considering this brief in the Nichols Case, from which these quotations are made, presenting the very question that is here in the instant case, and quoting the decision of the Board of Tax Appeals in the instant case when it was before it, the Supreme Court refused a certiorari in the Nichols Case. It will be seen from this that the Supreme Court had squarely presented to it the question whether the McKinney Case had been reversed by the Nichols Case and had before it the decision of the Board of Tax Appeals in the instant case, which decision we are asked to acquiesce in in this case. It also had before it the fact that the District Court in the Bowers Case, supra, had been followed by the Board of Tax Appeals. It therefore

had before it fully discussed, with the authorities cited, practically the identical case that is presented here and it refused a certiorari, holding in effect that there was nothing presented that was "worthy of review." We are asked here to reverse this conclusion of the Supreme Court and to hold that there is here something "worthy of review," a something not only worthy of review but of sufficient worth to carry us beyond the action of the Supreme Court to a reversal of the decision in the McKinney Case. It may be said that the Supreme Court in refusing a certiorari in the Nichols Case concluded that the Nichols Case presented a different question from the McKinney Case, and that there was no conflict between the two cases. If so, then there is no ground for a reversal by this court of the McKinney Case. But if the Supreme Court did not take this view, then it logically follows that it held that the Nichols decision was not in conflict with the McKinney decision, and that the latter should stand. No other explanation can be given of the action of the court.

As to the Nichols Case: The question in that case was a very different question from the one in the McKinney Case. The latter rested primarily on the construction of sections 202 and 213 of the Revenue Act of 1918, 40 Stat. 1060, 1065; the Nichols Case, on other sections of the same act. It is to be assumed that this court when it decided the Nichols Case in any event was mindful of its decision in the McKinney Case and gave it consideration; but that it had the case before it and considered it is shown by a reference to the case in the opening part of the defendant's brief in the Nichols Case, and its full discussion in the plaintiff's brief and in the amicus curiæ brief filed in that case.

In the briefs in that case also the above-cited cases of the Merchants' Loan & Trust Co. v. Smietanka and Bankers' Trust Co. v. Bowers were discussed. In the court's opinion in the Nichols Case, the McKinney Case is not mentioned or alluded to; although, as stated, it was cited and discussed in all three briefs. As showing the question considered and decided, this court said in the Nichols Case: "It thus appears that the one item has been treated as part of the value of the gross estate for estate-tax purposes and as part of the gross income of the estate for income-tax purposes, and the question for decision is whether it can be made to serve in both these capacities. We think the answer must be in the negative. For taxation purposes the individual's income during his lifetime and the income of his estate after his death are dis-

tinct things, the individual and his estate being separate entities."

The opinion then goes on to discuss certain sections of the revenue act, but does not mention or allude to or attempt to discuss section 202, or mention the McKinney Case, clearly indicating that it regarded the question as a different question from that decided in the McKinney Case, that is, it was simply a question of double taxation. The expression in the last line quoted, "the individual and his estate being separate entities," is seized upon as showing a conflict with and a reversal of the decision in the McKinney Case, and the language of the McKinney Case, "the executor is the personal representative of the decedent," was put in juxtaposition to it. This is an effort to take out sentences from opinions and consider them separately and concretely away from the context for the purpose of creating an apparent conflict. It is evident in the McKinney Case to any one reading the case in the light of the whole decision that the court was construing the language of section 202, and that when it used the above expression, "the executor is the personal representative of the decedent," it meant personal representative as related to the kind of income dealt with in section 202; that is to say, that under that section he still held the time-honored position and obligations of an executor at common law as distinguished from the statutory executor created by the act for dealing with the income of the estate while in his hands for taxation. The case rested entirely upon the construction of the language of section 202. The court in the Nichols Case had before it the question of the separate entities, under other provisions of the statute, of the decedent and his estate, of income received during his lifetime which must be accounted for as such for taxation, and income received by the executor while the estate was in his hands for administration and during his ad interim possession. It might in the McKinney Case have discussed these questions and elaborated its opinion by a fuller discussion of the question of the right of the commissioner to amend the statute by regulation and fix the basis for estimating the purchase price of the stocks by an appraisal at the death of the testator in the face of the language of the statute that the "basis" for ascertaining profit or gain was the "cost" to the decedent in purchasing the stocks. It did allude to this question when in the opinion it said that the statute contemplated "a purchase and a sale," that the statute "made no provision, and it is clear it did not intend, that any value other than

the market value on March 1, 1913, was to be considered. Had it intended otherwise it would have so stated." The court also said, "there was no 'cost' to the executors."

In the Nichols Case the income involved was *earned* income and personal in its character. Had the testator kept his books on an accrual basis instead of a cash basis, it would have been treated as income during his life and so assessed. It would have been earned income had the decedent lived, and was not, and did not become, at his death, income from capital. At his death his personalty disappeared and the estate necessarily became only capital. The executor assumed control of these capital assets. He earned nothing by so doing. Any income appearing thereafter was the income from these capital assets. The income was not treated as earned income by the decedent in his lifetime because he kept his books on a cash basis. But because it was not returnable as income during his life did not change the character of it as earned income or make it income earned by the executor after his death or by the assets of the estate, and therefore, not being income from assets, it was necessarily assets and a part of the corpus of the estate.

In the McKinney Case the income was not earned income through the personal efforts of the decedent. It was income (not economic but made taxable by section 202 of the statute) from the sale of property purchased during the life of decedent and sold after his death. It was unearned income as between the testator and executor, and the testator's death did not change its character. It was the testator's asset that was sold and not the asset of the executor. It was acquired by the testator. The executor did not acquire it, an estate cannot acquire itself, and "cost" meant cost to the testator, not cost to the executor who paid nothing and "acquired" nothing. It was cost to the testator just as the price paid by the purchaser from the executor was cost to the purchaser. It was actual cost, not a reasonable cost, or a fictitious cost, or an appraised cost at some time other than the date of purchase, and so the gain to be taxed under the statute referred to "actual gain" as between the purchase and the sale, not a fictitious gain created by an appraisal at the death of the purchaser. The distinction between the two cases is so obvious as to make it difficult to make it more so.

The plain theory of section 202 and the purpose in the mind of Congress was to fix definitely the basis for estimating actual profits, as distinguished from fabricated or

invented profits, and for estimating the amount of profits to be taxed, and to this end it was provided that where property was acquired prior to March 1, 1913, the basis for fixing said amount was the market value of the property acquired as of that date, and thus the following clearly appears:

First. That "acquired" referred to the purchaser or owner. An executor does not "acquire" property in the sense of the purchase of it. It passes to him by operation of law. Had the purchase in the present case been made prior to March 1, 1913, it could not be contended that the executor had acquired the property as of the date of purchase or at the time the purchaser of the testator acquired it. The only person who acquired under the facts of this case was the testator.

Second. It thus appears (section 202) that the "basis" being the market value as of March 1, 1913, where the purchase was made prior thereto it could not possibly be the market value at any other time, and certainly not the value at the death of the testator. To hold otherwise would be to amend the statute. To make the value as of the death of the testator would thus be a plain alteration and change in the statute and its declared purposes, a palpable ignorement of its language and meaning.

Third. It is plain that had the property involved in this case been purchased prior to March 1, 1913, the basis for ascertaining profits would necessarily have been held to have been its value as of that date, as fixed by the statute, thus treating the testator and his estate as a single entity and not separate entities and clearly demonstrating that as to tax on profits from the sale of property Congress so designed and intended.

The conclusion, therefore, is unescapable that in dealing with property purchased on or after March 1, 1913 [paragraph (2) of section 202], Congress intended the same principle and rule of entity to apply when it fixed the "basis" as the "cost thereof" when "acquired," and meant "cost" at the time when "acquired" by the testator and not cost on or after his death. Any other construction does as much violence to the conceded purpose of the statute as it would to apply it to paragraph (1), section 202, and to make the basis of value of a purchase prior to March 1, 1913, the value at the death of the testator. To hold otherwise is to amend the statute and graft something on it that was not put there by Congress.

The Supreme Court has gone further and held that this fictitious value as of the 1st of March, 1913, fixed by the statute, where the property was purchased prior thereto, though specifically provided therein as the basis for estimating gain, was not controlling, and that the "basis" intended by section 202 for ascertaining "gain" or loss was the "actual" gain or loss between the "purchase and the selling price," irrespective of this fictitious basis of the market value as of March 1, 1913, fixed in the statute.

In the case of United States v. Flannery, 268 U. S. 98, 101, 45 S. Ct. 420, 69 L. Ed. 865, after citing the cases of Goodrich v. Edwards, 255 U. S. 527, 41 S. Ct. 390, 391, 65 L. Ed. 758, and Walsh v. Brewster, 255 U. S. 536, 41 S. Ct. 392, 65 L. Ed. 762, the Supreme Court held that it was the intention of Congress only to levy a tax upon an "actual" gain as between the purchase price and the selling price, even though the gain thus shown was less than the gain shown between the value as of March 1, 1913, and the selling price, and that only such "actual gain" was subject to tax, even though a different and larger one was shown between the fictitious value as of March 1, 1913, and the selling price, and that this fictitious gain was not intended to be the controlling basis and could not be taken as the basis for ascertaining the tax as against "actual" gain.

It thus seems that had Congress inserted a further provision that when the sale was made by an executor the basis for estimating the gain would be the gain as between the value at the time of the testator's death and the sales price, the Supreme Court would have held that this was merely a "limitation" which would not control as against the "actual gain" as shown between the purchase price and the sales price.

It is interesting in this connection to note that the opinions in the cases of the Merchants' Loan & Trust Co. v. Smietanka, 255 U. S. 509, 41 S. Ct. 386, 65 L. Ed. 751, 15 A. L. R. 1305, Goodrich v. Edwards, and Walsh v. Brewster, supra, were all handed down on the same day and written by Mr. Justice Clarke. In the case of Walsh v. Brewster the purchase price was $191,000, the value as of March 1, 1913, was $151,845, and the selling price $191,000, being the same in amount as the purchase price. It will thus be seen that the difference between the fictitious value as of March 1, 1913, and the selling price was $39,155, and on this amount the commissioner assessed a tax. The lower court ([D. C.] 268 F. 207) held that this was error and that the difference between the purchase price and the selling price, which should be the basis, showed no "actual" gain. The Supreme

924

Court in sustaining this view of the lower court said: " * * * Since the owner of the stock did not realize any gain on his original investment by the sale in 1916, the judgment was right in this respect, and under authority of the opinion and judgment in No. 663, Goodrich v. Edwards, * * * also rendered this day." And again (alluding to the decision of the lower court): "The tax was properly assessed, but only upon the difference between the purchase and the selling price of the bonds as stated."

In the Goodrich Case, the court said: "Section 2(c) [this refers to the act of 1916, which is the same as that of 1918, here involved] is applicable only where a gain over the original capital investment has been realized after March 1, 1913, from a sale or other disposition of property."

It thus follows that unless some other basis is specially provided in the statute for taxing gains on the sale of property in the hands of executors, (2) of section 202 must be applied and construed as it was in these cases, viz., only "actual gains" are to be considered and that the basis for measuring these gains is the difference between the actual purchase price and the selling price, even though a different situation is shown by taking the fictitious limitation of value as of March 1, 1913. No such basis for estimating profits where the executor sells is to be found in the statute. Section 202 alone deals with gains or losses connected with the sale of property.

It cannot be questioned, and so far as known has not been, that the taxing act separated the income of a decedent received during his life for separate taxation, and the income received after his death by his executor (Nichols Case). It needs no great perspicuity to realize that the two incomes under the provisions of the statute for taxation purposes are separate and that income received by one, that is, during his life, was to be handled differently from income received after death. But it does not follow that this precluded Congress from providing a different basis of taxation where income was derived from the gains in the sale of property. or in providing a method of ascertaining such gains to treat the testator and his executor as a single entity. Nor does it follow that because it has done this that it becomes the duty of the court to read into the statute providing a basis for ascertaining such gains a different basis from that provided by the section itself.

Whether or not it be held under the provisions of certain other sections of the taxing act that certain property is to be treated as a part of the corpus of the estate rather than income received by the executor and not as both and subject to only one tax (Nichols Case), that decision or conclusion is not important in construing a separate section specially providing for the taxation of gains from the sale of property where the basis for ascertaining the gains is fixed by a different "basis." Whether the basis fixed by section 202 is consistent in the general scheme of things with other parts of the act is not important. Its purpose, as it states, is "for the purposes of fixing such a basis." The only question is what the language and meaning of section 202 shows to have been the purpose of Congress in enacting it. If it appears that Congress clearly intended by its language to place the executor as to property purchased after March 1, 1913, in the shoes of the testator as he was at common law, and to continue him as the testator's personal representative as to that section at least, it is not a matter of any weight in construing the section what other capacities have been assigned to an executor by other portions of the statute dealing with other and different conditions and income. The question in this case, as in the McKinney Case, is: What is the meaning of section 202? It prescribes the basis or yardstick for measuring "gains" for taxation from the sale of property. "Profits or gains" are taxed; "losses" are credited.

The question is: How did the section provide for the ascertainment of these profits? What was the "basis" for measuring them? In the instant case the stocks were purchased after the 1st of March, 1913. Section 202 provides that "for the purpose of ascertaining the gain derived or loss sustained from the sale" of property the basis shall be: "(2) In the case of property acquired on or after that date [March 1, 1913], the cost thereof; or the inventory value, if the inventory is made in accordance with section 203."

"Inventory" here mentioned deals with a trade or business and has no bearing on this case. It has, however, significance in connection with this case in that Congress in a certain class of sales departed from "cost" basis and provided the inventory value as a substitute basis for "cost" basis, indicating that in that particular, and that particular only, was an exception to be made as to "cost" as a "basis." With that exception "cost" was to be the "basis." It could very readily have provided, if it had intended so to do, while it was making the exception in the case of a trade or business for an inventory basis, that

when the property purchased was sold by the purchaser's executor after the death of the purchaser, the "basis" should be not "cost" to the purchaser but the difference between the sale price and the value of said property at the time of purchaser's death. But it did not do this and we can not supply the omission by reading into the statute something which is not there.

As the statute stands, the "basis" provided was the difference between the "cost" and the selling price, i. e., purchase and selling price (Walsh v. Brewster, supra, page 538 of 255 U. S., 41 S. Ct. 392), whether the decedent was dead or alive. Of course, Congress knew that people die and that very often property passing to an executor is thereafter sold, and in the light of this knowledge could have provided for another basis than the one provided by this section, but this it did not do.

We hold in this case, as we held in the McKinney Case, that under section 202 the basis provided for ascertaining loss or gain from the sale of property is the difference between the "cost" or purchase and the selling price.

The regulations fixing the appraised value at death for estate tax as the "basis" instead of "cost" named in said section was an attempt to add a provision to section 202 that it did not contain. It was an attempt to "graft something on the statute that was not there," Smietanka v. First Trust & Savings Bank, 257 U. S. 602, 42 S. Ct. 223, 224, 66 L. Ed. 391, something that was not within the express contemplation of the statute.

Judgment should be entered for the plaintiff, and it is so ordered.

BOOTH, Chief Justice, and WILLIAMS, Judge, concur.

LITTLETON and GREEN, Judges, took no part in the decision of this case.